

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NOS.  2-07-393-CR**
**2-07-394-CR**

DANA A. MCCRAY                                                                  APPELLANT

V.

THE STATE OF TEXAS                                                                  STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Dana A. McCray appeals his convictions for aggravated assault of a public servant and aggravated assault with a deadly weapon.  In three points he challenges the factual sufficiency of the evidence to support both convictions, contends the trial court erred by denying his *Batson* challenge, and

------------

[1] *See* Tex. R. App. P. 47.4.

claims the trial court improperly denied his requested instruction on self-defense against multiple attackers. We affirm.

## Background

Appellant began arguing with Carlos Toledo in the parking lot of a convenience store after appellant's car almost collided with Toledo's friend's truck, which Toledo had been standing next to. Two undercover Fort Worth police officers tried to intervene. After appellant stabbed Toledo and one of the officers, the other officer shot appellant.

## Factual Sufficiency

In his first point, appellant challenges the factual sufficiency of the evidence to support both convictions. Specifically, he contends the evidence is too weak to support his convictions.[2]

**Standard of Review**

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App.

---

[2] Although appellant's ending prayer asks for an acquittal on his first point, the argument under his first point deals only with factual sufficiency and specifically requests a new trial. Moreover, in oral argument, appellant confined his discussion to factual sufficiency only.

2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the factfinder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence

3

because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9. Our deference in this regard safeguards the defendant's right to a trial by jury. *Lancon,* 253 S.W.3d at 704.

**Applicable Facts**

**Carlos Toledo**

Toledo, the victim of the aggravated assault with a deadly weapon, testified that after work on June 15, 2006, he went to a convenience store on Lancaster and Beach Streets in Fort Worth around 7:00 or 8:00 p.m. His friend Isidro Salazar was driving the truck the two were riding in; Salazar parked the truck close to the store's entrance. Toledo went inside to make some purchases. After he came back out, he went to get back into the passenger side of the truck. As he was trying to get in, a man was backing out a car in the next space and almost hit the back of the truck. Toledo told the man to be careful, and the man "approached [him], and he cussed [him] and then stabbed" him with a knife.

4

The man tried to stab Toledo again, but "some police officers came and stopped him." Toledo said they identified themselves as police officers and told everyone to put their hands in the air. Toledo jumped on the sidewalk back toward the store. He saw the police officers holding the man, but he did not see appellant stab anyone else, nor did he see the shooting very clearly because he was feeling dizzy and almost fell. After he heard the shots, he saw the man, who fell and ended up on the ground. According to Toledo, "it was so quick."

On cross-examination, Toledo testified that when the man approached him, Salazar got out of the truck and came over "to go close to" him. He did not recall Salazar having a sledgehammer. However, a photograph was admitted into evidence, which Toledo identified as being the back of Salazar's truck, showing a sledgehammer in the back.

**Chad Mills**

Chad Mills, a former officer with the Fort Worth Police Department, testified that on June 15, 2006, he and his then-partner Officer Garrett Hull were working undercover investigating narcotics complaints. That night, Mills was wearing a blue short-sleeve T-shirt, a pair of blue jeans, and a pair of "all-purpose-type shoes"; he and Officer Hull would normally wear "[s]ome sort of plain T-shirt and a pair of jeans . . . and tennis shoes" when working

5

undercover so that they would not be recognized. But Mills also wore a badge on a neck chain under his T-shirt.

That night, Mills and Officer Hull stopped at the store on a break to get something to drink. After buying a drink, Mills went outside and waited by the car for Officer Hull to come outside. While he was waiting, he saw "some sort of confrontation" between the passenger of a pickup truck and the driver of a car,[3] whom he identified as appellant; he could hear the men arguing. As Mills was watching, appellant got out of the car "in an aggressive manner" and approached the truck; at the same time, the passenger, whom Mills identified as Toledo, got out of the truck so that the two were face to face. Mills then walked around the front of the truck and started to approach appellant and Toledo, intending to stop the fight. As he walked toward them, Mills pulled out his badge and identified himself as a Fort Worth police officer. He held the badge up by his face and told them to stop what they were doing. Appellant was facing Mills, and Toledo had his back toward Mills.

Mills saw appellant push Toledo; as he got closer and the two men separated, Mills realized that Toledo was holding his stomach. He did not realize that Toledo had been injured, though. Appellant then came toward Mills

_____

[3] The officers' vehicle was parked next to the truck, and appellant's car was on the other side of the truck.

6

with "his right hand in the air as if he were going to throw a[n] overhand-type punch" toward Mills. Mills took a step back and pushed appellant away while stepping aside trying to avoid appellant. But appellant reached over the top of Mills's left shoulder and stabbed him with a knife. Mills tried to step back farther, but appellant lunged toward him again. Appellant did not stab Mills a second time, however, because Officer Hull, who was standing behind Mills, shot appellant twice.

Mills testified that appellant fell to the ground after Officer Hull shot him, and the knife fell out of his hand. But appellant quickly got back up, grabbed the knife off the ground, and ran to the front doors of the store. Mills did not realize he had been stabbed; he and Officer Hull detained appellant before he could go inside the store. They then sought medical attention for Toledo, whom Mills realized had been injured. Mills did not know that appellant had stabbed him too until Officer Hull told him.

On cross-examination, Mills admitted that he did not see Salazar get out of the truck; he was focused on what was happening between appellant and Toledo. Mills testified that "immediately when [he] was identifying [himself] as a police officer is when [appellant] lunged towards [him] with his right hand and stabbed [him] in [the] shoulder." He clarified that when he pulled the badge out from under his shirt and displayed it, he also said loudly, "police officer, Fort

7

Worth police officer." According to Mills, the entire encounter lasted only seconds.

When Officer Hull shot appellant, Mills heard the shots coming from his left side. Mills testified that Officer Hull, who was dressed similarly to Mills, had identified himself as a Fort Worth police officer as well. Mills corroborated still photographs from the surveillance camera at the store, which indicated that the entire incident took less than one minute.

**Officer Bill Yeager**

Fort Worth Police crime scene officer Bill Yeager examined the scene after the stabbings and shooting. The State offered fourteen photographs of the scene taken by Officer Yeager as well as a diagram that he had prepared showing the location of the items he found.

Officer Yeager first found a fired casing under appellant's car. He found a second fired casing on the ground in front of appellant's car, but he never did find any bullets. Officer Yeager also photographed the blood trail from appellant; he said it was not a continual stream but spots or drops without a "discernable directionality." On the diagram, Officer Yeager drew the line of the blood trail around the back of Salazar's truck and the vehicle Mills and Officer Hull were driving up to the front of the store. Officer Yeager noted that

there were blood stains on the glass around the store's front door, the door itself, and the door handles.

On the sidewalk in front of the store, in between Salazar's truck and the officers' vehicle, Officer Yeager found a bloodstained white shirt. Also on the sidewalk, closer to the front door of the store, Officer Yeager found a ball cap. He found a cell phone in the parking lot just outside the store's front doors, near the path of the blood trail. Immediately in front of the store's front doors, Officer Yeager found a knife and a cap for the knife; a blood-stained, torn[4] orange shirt; two earrings; a blood-stained white tank top; a blood-stained receipt; and a blood-stained condom in a wrapper.

Officer Yeager testified that from the location of the casings, he could tell that the bullets were shot from the area in front of appellant's and Salazar's vehicles. He also testified that, in his opinion, the knife was a deadly weapon, capable of causing serious bodily injury or death.

On cross-examination, Officer Yeager admitted that the photographs he took at the scene did not show the blood trail that he drew on the diagram. He also admitted that it was "a possibility" that if someone had been shot at the

---

[4] Officer Yeager explained that the shirt's condition indicated "[m]edical intervention where the ambulance personnel arrive at the scene and remove the clothing."

9

door, it could create a spatter such as the one he observed on the door of the store. When asked if the blood spatter at the door was inconsistent with someone being injured by the vehicles, Officer Yeager stated,

> No. If somebody was injured, they could cause that blood spatter to be on the doors, and there also could be a blood trail - - whether it be two drops or 100 drops, there could actually be a blood trail on the parking lot. However, it was not - - the blood trail was not photographed or projected in a photograph from my testimony.

On redirect, Officer Yeager testified that the blood on the door handle was a smear, which indicates "someone already having blood on their hands and then smearing it down the handle or the blood was already there and then they - - they smeared the blood that was already there." According to Officer Yeager, the blood on the door was possibly consistent with someone bleeding from the chest with blood on his hands or someone transferring the blood to the door from bloody clothing or an injury. But Officer Yeager also admitted that if blood had been on the door, the officers could have smeared it when they walked in after the shooting. He also said that the blood trail he noted on the diagram that was around the vehicles did not show up on the photographs because of a malfunction of his camera's flash.

Officer Yeager admitted that he did not know who the earrings, receipt, or wrapped condom belonged to. He simply photographed them because he found them at the scene. But someone told him that the cell phone he found

10

belonged to appellant. There was blood spatter on the inside of the cell phone, which was lying in the open position.

**Officer Garrett Hull**

Officer Hull testified that on the night in question, he was exiting the store and going to the driver's side of the car when Mills got his attention. Mills told Officer Hull that he thought something was going on in the parking lot. Officer Hull then saw the car and truck parked next to them; he said it "looked like there was some sort of confrontation going on between the two parties." But he could not hear what the men were saying.

According to Officer Hull, he and Mills displayed their badges and had already begun verbally identifying themselves as police officers[5] as they were walking around to where appellant and Toledo were standing. Officer Hull was standing behind Mills as Mills got between appellant and Toledo; it was then that Officer Hull saw appellant stab Mills. Officer Hull described the stabbing and following events:

> I . . . saw that he had made a punching-type motion to Mr. Toledo, but I didn't realize at that time that he had a knife in his hand. It wasn't until I saw the defendant's hand above his head with the knife and come down on Chad is when I observed, oh,

---

[5] Officer Hull was also wearing a T-shirt and jeans, but, like Mills, he had his badge around his neck.

11

he's got a knife in his hand, and I realized that he had stabbed Mr. Toledo as well.

. . . .

[T]he whole time, approaching the situation, I was constantly identifying ourselves as police officers trying to get it to stop. And, at that time, I realized that the threat was imminent, and he - - Chad - - when Chad got stabbed, he kind of pushed away from the defendant, and the defendant was still in a real close proximity to us and Mr. Toledo, and he still had the knife raised in an aggressive manner, so it was an imminent threat. And, at that time, I drew my service weapon and fired.

Officer Hull said that he used deadly force against appellant because he thought he, Mills, and Toledo were all at risk of serious bodily injury or death because of appellant's actions. Officer Hull saw the driver of the truck, Salazar, inside the truck during the argument and also saw him get out of the truck after the stabbing to check on Toledo; however, he never saw Salazar with a sledgehammer.

**John Salazar**

John Salazar[6], a witness who was pumping gas during the incident, testified that he saw "a skirmish, a fight" in front of the store. As he described it, the events "started out with a verbal argument, and then . . . rose to a kind of shoving match to a fight." According to Salazar, the two men just started

_____

[6] Isidro Salazar, Toledo's friend and the driver of the truck he was riding in, did not testify.

12

out talking to each other, then got in each other's faces, shouting and then shoving. It was too far away for him to hear what the men were saying, but he heard shouting. When the first officer approached the men, Salazar could tell that he was telling them something, but he was too far away to hear exactly what. He could not hear whether Mills identified himself as a police officer.

Salazar testified that when Mills arrived at the two men, he started to "break up the fight." He then took aside appellant and was talking to him, "and they started putting hands on each other and then, . . . they were fighting." According to Salazar, appellant and Mills "kind of wrestled around a couple of seconds." Officer Hull then came out of the store, and Salazar heard someone shout, "[H]e's got a knife"; Salazar heard Officer Hull say freeze and saw him fire two shots a couple of seconds later. Salazar was certain Officer Hull said "freeze" but could only say that he *thought* Officer Hull also said "freeze, police."[7] Salazar did see Officer Hull's badge in "his torso area."

Salazar said that appellant "ran kind of like in a half circle back towards the store door" after he had been shot. In other words, he initially ran toward the rear of the vehicles but then turned back to go toward the store doors,

---

[7] Salazar clarified, "I was too far away to hear exactly what he was saying."

13

which is where he collapsed. Salazar testified that the route he saw appellant take was consistent with the blood trail outlined by Officer Yeager. Salazar could not recall what direction appellant was facing when Officer Hull shot him. He did not see a knife in appellant's hands, but he was about twenty-five to thirty feet away from what was happening.

**Charles Hollie**

Charles Hollie testified that he had gone to the store to buy a drink. As he was waiting in line, he heard "a little bang, like a shot." He looked around and saw a man running toward the store; he then heard someone say "police, freeze," followed by another gunshot. He saw Officer Hull shoot appellant in the arm. The State questioned Hollie about the statement Hollie gave to the police about an hour after the shooting in which he stated that he heard "police" before the first shot. When confronted with his statement, Hollie initially maintained that he heard Officer Hull say "police" after the first shot. But when asked if he was not telling the truth in the statement, Hollie said, "I really don't remember ma'am. I'm just - - I really don't remember."

**Victoria Van Fleet**

Victoria Van Fleet, a forensic firearms examiner with the Fort Worth Police Department, examined the T-shirt appellant had been wearing when he was shot to determine whether holes in it were "bullet defects" and to see if

14

she could "notice any gun powder or some kind of residue on it to determine . . . a muzzle-to-target distance." She found a hole in the left arm that appeared to be caused by the passage of a bullet; the hole was a little smaller in the front than in the back, possibly indicating that the direction of the shot was from the front to the back. She also examined a white tank top that appellant had been wearing; it had a hole that was "quite a bit larger" in the back than in the front. She testified that this was consistent with a hollow point bullet[8] passing from the front to the back of the shirt because those bullets expand upon striking something. However, Van Fleet also testified that she could not be sure the holes she saw in the shirts were bullet holes; the chemical tests she ran for gunpowder and lead came back negative. She conceded on cross-examination that it is possible that holes in the back of a shirt could become bigger from a person's lying on the ground and being moved around.

When asked by appellant's counsel whether a surgeon could tell which way a bullet entered a person's body by the direction it was facing when the surgeon removed it, Van Fleet explained that a bullet can rotate inside a person after entry, "[s]o just because the direction is pointing one way does not mean

---

[8] According to Van Fleet, the Fort Worth Police Department uses hollow point bullets.

15

that's the way it was fired." Also on cross-examination, the defense offered, and the trial court admitted, appellant's medical records, in which the doctor treating his gunshot wound stated numerous times that one of the wounds was to appellant's back, exiting his left nipple. But Van Fleet also testified, both on direct and cross, that the report said elsewhere that the *entrance* wound was under the nipple. In addition, the discharge report showed that appellant had been treated for a "GSW left chest."

### Detective Troy Lawrence

The State called Troy Lawrence, a Fort Worth police detective. He testified that he interviewed three adults and one child who had witnessed some of the events at the store. He also retrieved the store's video surveillance system on a CD. The State offered still photos from the surveillance system. However, none of those photos show clearly what happened outside the store, only what was going on inside.

The State played a recording of Detective Lawrence's interview with Hollie. When asked what he saw and heard that night, Hollie told Detective Lawrence that he heard a shot, "police, police," and a second shot. When Detective Lawrence asked Hollie to clarify when he heard "police, police," Hollie initially said "after," but then quickly corrected himself and said that he heard it before the first shot. According to Hollie, he heard the first shot, saw

16

appellant running, heard the second shot, and finally heard appellant say, "Allright, allright" and fall down in front of the door. But he also said that he hid after the second shot.

On cross-examination, Detective Lawrence testified that when reviewing the surveillance tape, he could hear the gunshots but not any talking outside the store; however, he also said that just because the recorder did not pick up the sound of voices outside the store did not mean that a person inside the store could not have heard them.

**Appellant's Witnesses**

Appellant called three witnesses, two of whom testified that before the incident, appellant had been at their house to watch television and had left sometime after 8:00 p.m. to go to the store. Marsha Adams, a Fort Worth police administrative assistant in the internal affairs division, testified that no internal affairs investigation file for Officer Hull existed.

**Analysis**

Appellant contends that the following shows that the evidence as a whole is too weak to be factually sufficient as to both convictions: (1) John Salazar, the witness who was pumping gas at the time of the incident, heard Mills say, "freeze," but could not be sure that he heard him say "freeze, police"; (2) the blood spatter on the door and the medical reports support a contention that

17

appellant could have been shot in the back rather than in his chest; and (3) "the witnesses called by [appellant] established that [appellant] appeared to have no anger issues or an agenda when he left the house other [than] to buy beer and return to watch a ball game."

The jury is the sole judge of the weight and credibility of the evidence and is entitled to resolve conflicts in the evidence. *See* Tex. Code Crim. Proc. Ann. art. 36.13 (Vernon 2007); *Johnson*, 23 S.W.3d at 7. The jury was thus entitled to believe Toledo, Mills, and Officer Hull, who all testified that the officers identified themselves to appellant before he stabbed Mills. Moreover, it was also entitled to resolve the conflict between Hollie's in-court testimony and his recorded statement and believe that the version of the facts in his statement was more credible. Accordingly, we conclude that the fact that a different witness, who was not standing as close to the events as the others, may or may not have heard the officers identify themselves as such, does not render the evidence too weak to support the conclusion that appellant knew Mills was an officer. Moreover, this evidence has no bearing on the conviction for aggravated assault of Toledo with a deadly weapon.

Additionally, we fail to see how where Officer Hull shot appellant (either in the back or in the chest, or by the vehicles or the store door) has any bearing on the credibility of the witnesses who testified that appellant stabbed both

18

Toledo and Mills or how it creates doubt about his knowledge that Mills was a police officer. The jury was entitled to believe that appellant, having heard and seen Mills identify himself as a police officer, nevertheless stabbed him, then attempted to flee.

Finally, although appellant contends that his witnesses "established that [he] appeared to have no anger issues or an agenda when he left the house other [than] to buy beer and return to watch a ball game," we note that neither witness testified about appellant's emotional state. They testified simply that appellant was at their house watching a game and then left in the evening to go to the store. Neither was at the store when the event occurred, and their testimony has no bearing on what happened when appellant arrived there. Additionally, their testimony does not serve to weaken the testimony of the eyewitnesses and participants.

We have detailed all the evidence from which the jurors could have concluded that appellant was guilty of both offenses beyond a reasonable doubt; after considering appellant's contentions and the evidence as a whole, we cannot say that it is so weak that the jury's verdict was clearly wrong and manifestly unjust. Accordingly, we conclude and hold that the evidence is factually sufficient to support both of appellant's convictions, and we overrule appellant's first point.

19

**Self-Defense Against Multiple Attackers Instruction**

In his third point,[9] appellant contends that the trial court erred by denying his request for a jury instruction on self-defense against multiple attackers. The State contends that the issue need not be reached because there was no evidence to support any self-defense instruction in light of appellant's use of deadly force.

**Applicable Law**

A defendant is entitled to an instruction on every defensive issue raised by the evidence "whether that evidence is weak or strong, unimpeached or uncontradicted, and regardless of what the trial court may or may not think about the credibility of the defense." *Allen v. State*, 253 S.W.3d 260, 267 (Tex. Crim. App. 2008); *see* Tex. Code Crim. Proc. Ann. arts. 36.14–.15 (Vernon 2007); *Quattrocchi v. State*, 173 S.W.3d 120, 122 (Tex. App.—Fort Worth 2005, pet. ref'd). A self-defense against multiple attackers charge is warranted if "there is evidence, viewed from the accused's standpoint, that he was in danger of an unlawful attack or a threatened attack at the hands of more than one assailant." *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985) (quoting *Wilson v. State*, 140 Tex. Crim. 424, 145 S.W.2d 890,

---

[9] We address appellant's third point out of order because it relies in part on the facts discussed in his first point.

20

893 (1940)).[10] Thus, the issue is whether there is evidence that, viewed from appellant's standpoint, he was in danger of an unlawful attack or threatened attack from Toledo, Mills, and Officer Hull.

**Analysis**

Appellant's requested instruction read as follows: "This right of self-defense also applies when the defendant reasonable [sic] believes that he is under attack by more than one person. In such circumstances, the defendant has a right to defend himself against any one or more of the persons or against all of them." Appellant points to the evidence that the entire incident happened quickly in "a matter of seconds." He contends that the short time frame raises the issue of whether he perceived himself under attack from all three persons; in other words, while he was arguing with Toledo, Mills and Officer Hull came upon him so fast that he perceived he was the victim of a concerted group attack. He also points to the evidence that John Salazar, the man pumping gas at the time, saw Toledo and appellant shouting at and shoving each other and

---

[10] The State contends that a separate instruction is not required in this case because it is not a statutory defense under the penal code. *See Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) ("[A] defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction."), *cert. denied*, 525 U.S. 1147 (1999). But we need not decide whether such an instruction is available, given our disposition of appellant's point. *See* Tex. R. App. P. 47.1.

21

the testimony that Mills pushed appellant first after getting in between appellant and Toledo.

Viewing the evidence in the light most favorable to appellant, we conclude that he has not shown he was entitled to such an instruction, if one is even available. *See Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999).

> The theory behind the multiple assailants charge is that, when it is clear that an attack is being conducted by multiple people as a group, a defendant is justified in using force against any member of the group, even if the recipient of that force is not engaging in conduct that would, by itself, justify the use of force (or deadly force as the case may be).

*Dickey v. State*, 22 S.W.3d 490, 493 (Tex. Crim. App. 1999) (Keller, J., concurring); *see Black v. State*, 65 Tex. Crim. 336, 145 S.W. 944, 945–47 (1912) (explaining deficiency in charge that did not incorporate this concept).

Here, the evidence shows that appellant stabbed Toledo before Mills got to the two men. Toledo and Mills, the two closest to appellant at the time, both testified that Mills was identifying himself as an officer while approaching. Officer Hull did not see appellant stab Toledo, and he testified that he did not draw his weapon until *after* appellant stabbed Mills. He was behind Mills and not involved in the physical confrontation; in fact, there is no evidence that appellant even saw Officer Hull.

22

John Salazar's version of events does not contradict the other witnesses' versions of the events in these respects; he simply could not confirm what was or was not said because he was standing too far away. He testified that Mills was already wrestling with appellant before Officer Hull came out of the store. He also heard someone say that appellant had a knife before he heard shots.

Appellant's requested defense appears to rely on the absence of evidence rather than on "weak or strong, unimpeached or uncontradicted" evidence that was actually admitted. Accordingly, we conclude and hold that, regardless of the availability of the requested instruction at law, the defensive issue was not raised by the evidence and, therefore, the trial court did not err by refusing to include it in the charge. We overrule appellant's third point.

### *Batson* Challenge

In his second point, appellant challenges the trial court's ruling denying his *Batson* challenge.

**Applicable Facts**

At the end of voir dire, the trial court called the following veniremembers to be seated on the jury: 4, 11, 13, 22, 24, 29–31, 36, and 38–40. Instead of being sworn in at that time, the trial court released the jury until the next day. The next day, the trial court called the same juror numbers and then administered the oath. Afterwards, appellant's counsel asked the trial court,

23

"Your Honor, am I to understand that a juror has changed?  No one brought that to my attention."  The trial court then explained that the day before, when he had called the selected jury members, number 34, who had not been selected and whom the State had peremptorily struck, sat in the jury box with the other selected jurors and number 40 mistakenly left with the other discharged veniremembers.  The mistake was corrected so that when the jury was sworn, number 40 was seated instead of number 34.

Appellant's counsel then raised a *Batson* challenge on the ground that "the jury was composed of three African-Americans on yesterday evening . . . [a]nd this morning, it's composed of two African-Americans." Juror 34 is an African-American female, and appellant is an African-American male.

The State pointed out to the trial court that the jury had already been sworn,[11] but the trial court requested that the State respond to the motion

---

[11] The State contends that appellant's *Batson* challenge was untimely because the jury had already been sworn.  *See* Tex. Code Crim. Proc. Ann. art. 35.261 (Vernon 2006); *Hill v. State*, 827 S.W.2d 860, 873–74 (Tex. Crim. App. 1992), *cert. denied*, 506 U.S. 905 (1992).  In these unusual circumstances, however, appellant was apparently not able to discern the change in the panel from the day before until the jury was actually being sworn and he could visually examine the correct panel.  And appellant raised his challenge immediately after the jury was sworn.  Accordingly, on these facts, and in the interest of justice, we will address the merits of his complaint.  *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103(a)(1); *Lagrone v. State*, 942

24

nevertheless. The State explained that it struck juror 34 because in her questionnaire, she indicated that her ex-husband had been in and out of prison for years in response to a question about whether she or someone close to her had had an unpleasant experience with law enforcement. The defense then offered the questionnaires of five other non-African-American[12] veniremembers—Jurors 10, 11, 17, 39, and 43, two of whom were seated on the jury—who also answered that they or a family member had had a bad experience with law enforcement. According to the defense, the State's explanation failed because it did not strike these similarly situated veniremembers. The trial court denied appellant's *Batson* challenge, stating, "At this time, I'm going to find that you failed to meet the burden of showing there was a disproportionate number of jurors who were struck as a minority race. I'll find that this is a race-neutral jury."

---

S.W.2d 602, 618 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997); *Polk v. State*, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987). Moreover, because we hold that he is not entitled to relief on the merits, our disposition is the same. *See* Tex. R. App. P. 47.1.

[12] The only part of the record indicating the race of the veniremembers is appellant's counsel's statement that "for the record . . . I do believe they are members of the Caucasian race."

**Applicable Law**

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits race-based jury selection.  U.S. Const. amend. XIV; *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986); *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).  When a defendant challenges the racial composition of a jury under *Batson*, he or she must prove that the prosecutor engaged in purposeful discrimination against a member of a constitutionally protected class in exercising the State's peremptory challenges.  *Batson*, 476 U.S. at 96–98, 106 S. Ct. at 1723–24; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 92 (2008).  The defense must first make a prima facie case of racial discrimination (step one).  *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770–71 (1995); *Watkins*, 245 S.W.3d at 447.  The burden of production then shifts to the State to come forward with a race-neutral explanation (step two).  *Purkett*, 514 U.S. at 767, 115 S. Ct. at 1770–71; *Watkins*, 245 S.W.3d at 447.  If the State tenders such a race-neutral explanation, the trial court must then decide whether the defendant has proved purposeful racial discrimination (step three).  *Purkett*, 514 U.S. at 767, 115 S. Ct. at 1770–71; *Watkins*, 245 S.W.3d at 447.

26

The step-two explanation need only be race neutral on its face. *Purkett*, 514 U.S. at 767–68, 115 S. Ct. at 1771; *Watkins*, 245 S.W.3d at 447. The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the defendant has satisfied his or her burden to prove the strike was indeed the product of the State's purposeful discrimination. *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771; *Watkins*, 245 S.W.3d at 447. Whether the defendant satisfies the burden of persuasion to show that the proponent's facially race-neutral explanation for the strike is pretextual and not genuine is a question of fact for the trial court to resolve in the first instance. *Watkins*, 245 S.W.3d at 447; *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004); *see Purkett*, 514 U.S. at 769, 115 S. Ct. at 1771.

After the defendant has made out a prima facie case of racial discrimination, if the trial court then proceeds immediately to the second step by inquiring of the State whether it had a nondiscriminatory purpose—as the trial court did here—a reviewing court is to assume that the defendant has satisfied the step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps. *Watkins*, 245 S.W.3d at 447–48. The court of criminal appeals has explained this court's role on review of a trial court's *Batson* ruling as follows:

27

The reviewing court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous. In assaying the record for clear error, *vel non*, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. But a reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.

*Id.* at 448 (citations omitted).

In our analysis of the second and third steps, we are guided by the Supreme Court's recent opinion in *Miller-El v. Dretke*, in which the Court "considered the combined impact of a number of factors in concluding that, by clear and convincing evidence, the prosecutors exercised two peremptory challenges on a racially discriminatory basis, notwithstanding the race-neutral explanations they offered at the *Batson* hearing." *Id*. (citing *Miller-El v. Dretke*, 545 U.S. 231, 266, 125 S. Ct. 2317, 2340 (2005)). Among the factors the Court considered in *Miller-El*, viewing the voir dire as a whole and considering the collective and cumulative impact of those factors, were (1) statistics showing the State struck a higher percentage of African-Americans than non-African-Americans, (2) the State's given reasons for striking African-American jurors appeared to apply equally to non-African-American jurors the State did

28

not strike, (3) evidence that the State used jury shuffles in an attempt to manipulate the racial makeup of the panel, (4) the State questioned African-American and non-African-American jurors differently and in a way designed to obtain answers justifying strikes of African-American jurors, and (5) evidence that Dallas County had a formal policy of excluding minority jurors from service. *Miller-El*, 545 U.S. at 240–64, 125 S. Ct. at 2325–39; *Watkins*, 245 S.W.3d at 448–49.

Only the second factor was raised during the *Batson* hearing in appellant's case. Accordingly, although we are not limited to considering only those matters specifically raised at the hearing, we will begin by undertaking a side-by-side comparison of Juror 34 with Jurors 10, 11, 17, 39, and 43.

**Comparative Juror Analysis**

**Juror 34**

Juror 34's questionnaire showed that she was forty years old. She listed her occupation as "CDL Driver Prospect." Her education was listed as "Complete 10th/w diploma."[13] To the question, "Have you or someone close to you ever had an unpleasant experience with the police," she answered, "ex-

---

[13] The copy of the questionnaire is light, and it is possible the notation says, "Complete 12th/w diploma." Either way, it appears she has a high school education.

29

husband in and out of prison for years." In response to the question, "Have you or someone close to you ever been arrested for or charged with a crime ([i]ncluding hot checks)," she answered, "Traffic Ticket 1997." She had never served on a civil or criminal jury. The only party to question Juror 34 directly was the State, who asked, "[Y]ou've had family that was involved in the criminal justice system. Is there anything about that case that would affect you sitting as a juror here?" The juror responded simply, "No." The State did not question her further.

**Juror 10**

Juror 10, a thirty-six year-old male, indicated on his questionnaire that he was a teacher and that his wife also worked for the same school district. He had a master's degree in Christian Education. In response to the question about unpleasant experiences with the police, he answered, "older brother got into much trouble with DWI's and such - of course, I only heard his side." He had never served on a criminal or civil jury.

During questioning by the State, he volunteered the following: "It was not with a deadly weapon, but my wife was raped before I met her, so she was assaulted." When asked if he would have strong feelings about the instant case, he stated, "Well, I certainly have strong feelings, but I don't know - - I can't say how I would feel based on the facts in any case." He admitted it was

30

possible that "there might be some part of the emotional part that involves violence that [he] might have a hard time with," but he also added that his wife's assault had taken place "a long time ago." The defense challenged him for cause.

On further questioning by the trial court, Juror 10 stated that what happened to his wife would not affect his judgment in the case, that the two cases were "totally different," and that his wife's assault did not seem to be relevant to the instant case. He also stated that he could be fair and impartial to appellant and the State.

Thus, although Juror 10 also listed a close family member with more than one unpleasant experience with the police, his brother, he also was married to someone who had been the victim of an assault. Additionally, when defense counsel asked who wanted to serve on the jury, Juror 10 responded that he did. Accordingly, we conclude and hold that there are sufficient differences between Juror 10 and Juror 34 such that the State's reasoning did not apply equally as to both of them.

**Juror 11**

Juror 11 was fifty-eight at the time of trial, and he listed his occupation as "Ret Fed Gov't." For his educational background, he listed "AA Degree." In response to the question about bad experiences with police, he listed, "Wife

31

arrested erroneously. Same name & someone with a warrant." He had also served in the United States Army and had a nephew who was a Grand Prairie policeman. Finally, Juror 11 had served on both a civil and a criminal jury in the past.

When the State asked whether he could be fair (presumably in relation to having a relative in law enforcement), he stated, "I think I could be fair." When asked if, with respect to his "experience," he could "put that aside and judge each person as they came in here," he said, "Yes, ma'am." Later, Juror 11 and defense counsel engaged in the following colloquy:

> [Juror 11]: Well, I think you have the right to defend yourself by any means necessary to get out of the situation.
>
> [Defense counsel]: Okay.
>
> [Juror 11]: Unless it's against law enforcement, then he has the gun and you don't have a right to pull a gun against him.
>
> [Defense counsel]: Okay. But what if I didn't know it was law enforcement?
>
> [Juror 11]: Well, you should have been warned prior to.
>
> [Defense counsel]: Okay. So in the course of me being attacked and defending myself, I should be more astute as to who the person is?
>
> [Juror 11]: No, I'm not saying that. Law enforcement would inform you that they're law enforcement.

Juror 11 ultimately sat on the jury.

Unlike Juror 34, Juror 11 had a relative in law enforcement. And, also unlike Juror 34, his spouse's experience with the police was a one-time event, not multiple encounters over a period of years. Additionally, his wife's experience was one of mistaken identity and presumably did not involve prison time. Accordingly, we conclude and hold that Juror 11's characteristics that could be considered more favorable to the State distinguish him sufficiently from Juror 34 such that the State's failure to strike him does not show pretense as to its striking Juror 34.

**Juror 17**

There is some confusion in the record regarding Juror 17; it appears that two jurors, 17 and 20, shared the same last name.[14] Juror 17 was 69 years

_____

[14] Although the State contends in its brief that it "can find no indication that there were two veniremembers with the same last name," it is clear that Juror 20, whom the trial court questioned separately, had the same last name as Juror 17. The trial court identified Juror 20 specifically after striking him for cause; Juror 20 had told the trial court point-blank that he could not be fair and impartial in the case because his wife had been a victim of a violent sexual assault. Juror 17's questionnaire has "No" circled in response to the question about whether the juror or someone close had ever been the victim of a crime. Earlier, when the prosecutor was asking whether panel members could be fair in light of their experiences with the police, she asked Juror 17 if he "felt like the process was fair or [if he] could . . . put that aside?" He answered, "[Y]ou may have the wrong [person with the same last name]. I've got grandsons, but I wasn't really involved." When she further asked, "So you weren't close enough to that for it to affect you, sitting in this room," he answered, "No." Although the record is somewhat confusing, it is apparent that Juror 17 and Juror 20 had the same last name. Accordingly, we will not attribute Juror 20's

old and retired from the National Weather Service. His wife was retired from the "Texas Probation Dept." He had previously served on both a civil jury and a criminal jury. He listed his education as "High school grad with some college." In response to the question about unpleasant experiences with the police, he stated, "I have grandsons that are or have been in prison in Oklahoma." He had a nephew who was an Everman police officer, and he had served in the United States Air Force for ten years.

In response to the State's questioning about whether his grandsons' unpleasant experience with law enforcement would affect him, Juror 17 answered, "No," after which he volunteered, "I've got a nephew that's a police officer." Based on the foregoing, we conclude and hold that Juror 17's experience with law enforcement, in addition to his other questionnaire answers which could be perceived as more favorable to the State, was sufficiently different from Juror 34's such that the State's failure to strike Juror 17 does not show that its stated reason for striking Juror 34 was merely pretextual.

**Juror 39**

Juror 39, a female, was twenty-seven at the time of trial. She listed her occupation as an elementary school teacher's assistant and "CNA Cherry Tree

---

answers to the trial court's questions to Juror 17.

Residential." Under "Educational Background," she wrote, "college education."

In response to the negative experience with law enforcement question, she

noted, "Pulled over because someone [else] had tickets in my car and a license

plate light was out." To the question asking if the juror or someone close had

ever been arrested for or charged with a crime, she answered, "Boyfriend theft

by check off probation 6 yrs." She had never served on a jury before. Juror

39 was seated on appellant's jury.

Although she did not note it on her questionnaire, when asked by the

State whether her bad experience with law enforcement would affect her as a

juror, Juror 39 answered,

> [Juror 39]: No, ma'am. I have family in law enforcement as well
> as - -.
>
> [State]: So you could - - either way?
>
> [Juror 39]: Yeah.
>
> [State]: You wouldn't be biased toward them because of your
> family relationships and you wouldn't be bais[ed] against them
> because - -
>
> [Juror 39]: No.

Jurors 34 and 39 were similar in that they had both had traffic-related

encounters with police and had someone close to them charged with a crime.

The record is not developed about the extent to which this might have affected

35

either woman; we do not know how close Juror 34 was to her ex-husband or her feelings toward him at the time of trial, nor do we know anything about Juror 39's relationship with her boyfriend. Their experiences could likely be distinguished on the basis that Juror 34's ex-husband apparently had chronic problems with the law while, in contrast, Juror 39's boyfriend had been out of trouble for at least six years after his probation. Moreover, Juror 39 said during questioning that she had family in law enforcement. And although she said that she would not be biased for or against a police officer, it makes sense that the State would favor jurors with relatives in law enforcement in a case such as this, in which appellant was accused of assaulting a police officer. For these reasons, we conclude and hold that the State's failure to strike Juror 39 does not show that its reasons for striking Juror 34 were not race-neutral or merely pretextual.

**Juror 43**

Juror 43 was forty-nine years old at the time of trial. He listed his occupation as "Millwright Self Employed," and he had a tenth grade education. In response to the negative experience with law enforcement question, Juror 43 wrote, "Friend Agg Aus." He also noted that his stepson had been arrested or charged for "drugs." He had not served on a civil or criminal jury and did not have a relative in law enforcement.

36

When the State asked Juror 43 whether his friend's experience would affect him in this case, he answered "No." He also said that he could be fair to both sides. When the defense asked the panel what they first thought when they heard the offense, he answered, "I feel like I would have to have more [details]."

The similarities between Juror 43 and Juror 34 are much closer. Both were in their forties and had about an equal amount of education. Neither had previously served on a jury. Juror 43's answers to the law enforcement and crime questions do not indicate whether his friend's and stepson's problems were chronic or one-time, nor do they explain whether either of them spent time in jail or prison. However, we do know that Juror 34's ex-husband not only had been arrested and charged, he was "in and out of prison for years." Finally, the State notes that Juror 43 was toward the end of the strike zone and, thus, unlikely to be selected. In fact, he did not sit on the jury.

Although there is a much closer question as to Jurors 34 and 43, there are at least some distinguishing characteristics between the two. And even if there were not, faced with the record of the entire voir dire—which shows that out of three African-Americans on a panel of more than forty-three, two sat on the jury and only one was struck—we cannot say that the trial court clearly erred in overruling appellant's *Batson* challenge. *See Watkins*, 245 S.W.3d at

37

453 (holding, when State struck one African-American juror and three non-African-American jurors for having reservations about assessing a life sentence, but did not strike other non-African-American juror who also expressed reservations, that "[w]e are unable to say on this state of the record that [the African-American juror] was struck on a basis that did not apply equally to *most* of the non-African-American veniremen" (emphasis added)).  In addition to showing that a fairly high percentage of African-Americans actually served on the jury, the record does not reveal a pattern of disparate questioning,[15] nor is there any indication that the prosecutors used a jury shuffle at all, much less for an improper purpose.  Although the prosecutor did not question Juror 34 any further once she said her ex-husband's experience would not affect her in this case, she likewise did not ask follow-up questions of at least some of the other panel members.  Accordingly, on this record, we conclude and hold that the trial court's denial of appellant's *Batson* challenge was not clearly erroneous.  We overrule appellant's second point.

---

[15] Not knowing the identities of the two African-American jurors who sat on the jury, we cannot evaluate whether the lack of further questioning was limited only to African-American jurors.

38

## Conclusion

Having overruled appellant's three points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON and MCCOY, JJ.; WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment)

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 26, 2009